IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 28, 2017

**STATE OF TENNESSEE v. MICHAEL DEMOND STARKS**

**Appeal from the Criminal Court for Wilson County**
**No. 2013-CR-72, 2013-CR-73, 2016-CR-37     John D. Wootten, Jr., Judge**

———————————————————

**No. M2016-01827-CCA-R3-CD**

———————————————————

After a jury trial, the defendant, Michael Demond Starks, was convicted of one count of second-degree murder, one count of attempted first-degree murder, four counts of attempted second-degree murder, and two counts of aggravated assault.  On appeal, the defendant argues the evidence was insufficient to support his convictions because he was suffering from severe mental delusions.  Additionally, the defendant argues the jury was improperly instructed on the lesser-included offense of voluntary manslaughter and that the trial court improperly excluded hearsay statements from a defense witness.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT W. WEDEMEYER, J., joined.

Tillman W Payne, III, Nashville, Tennessee, for the appellant, Michael Demond Starks.

Herbert H. Slatery III, Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Tom P Thompson, Jr., District Attorney General; and Matthew Todd Ridley, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

This case arises from a shooting that took place on December 20, 2012.  The defendant shot the victim, Desmine Rashad Watts, after he arrived at the defendant's apartment.  The defendant then fled the scene in his vehicle and fired additional shots into another vehicle while on the interstate.  On March 12, 2013, the defendant was indicted in Wilson County with one count of first-degree premeditated murder for the killing of

the victim. The defendant was later indicted with five counts of attempted first-degree murder, five related charges for attempted second-degree murder, and two additional counts of aggravated assault.

On December 20, 2012, the victim, Terrinessha Crowell, and Lela Crowell were out "finish[ing] Christmas shopping."[1] The victim was driving with Terrinessha riding in the front passenger seat and Lela Crowell riding in the back seat. While out, the victim wanted to visit the defendant because the defendant's mother passed away a few days earlier. Terrinessha testified that the defendant was often known by the nickname "Buddy." Terrinessha watched the victim from the passenger seat of the vehicle as he walked to the defendant's apartment and knocked on the door. After the defendant opened the front door, Terrinessha heard gunshots. She turned and saw the defendant firing a weapon at the victim. Terrinessha observed the victim run away, holding his face.

As the defendant approached the vehicle, Terrinessha quickly moved into the driver's seat and backed out of the driveway. Lela confirmed Terrinessha's account, stating that after the victim fled, the defendant approached the vehicle brandishing a weapon. After fleeing the scene, Terrinessha found the victim across the street from the defendant's apartment, lying in the entrance to an auto shop.

Douglas Hodge was working at the auto shop when he witnessed an African-American man matching the defendant's description shooting at the victim. Mr. Hodge then saw the defendant flee the scene in a red vehicle.

Officer Robert Bates of the Lebanon Police Department responded to a shooting call near the defendant's apartment complex. When he arrived at the auto shop, Officer Bates found the victim had suffered "a gunshot wound to the face" and "complaining of not being able to breathe." Officer Bates also observed other gunshot wounds to the victim's torso. The victim identified his shooter to Officer Bates as "Buddy." The victim died shortly after being transported from the scene in an ambulance.

Detective David Willmore photographed the scene including the shell casings and blood spots found at the scene. He also photographed additional shell casings found inside the defendant's red vehicle.

After fleeing the scene, the defendant drove along Interstate 40. While driving on the interstate, the defendant encountered a vehicle driven by Jamie Faye Luge Cartmell.

---

[1] Because the witnesses share the same last name, we will refer to each witness by her first name. No disrespect is intended.

In the vehicle with Ms. Cartmell was Nickola Dowell, who was seated in the passenger seat, and three minor children, who were seated in the rear seats. Ms. Cartmell noticed a red vehicle behind her that was aggressively sounding its horn. When Ms. Cartmell changed lanes to allow the vehicle to pass, she saw the defendant was driving. Ms. Cartmell was able to identify the defendant because she knew him as a "friend of the family." The defendant brandished a weapon, aimed, and fired into Ms. Cartmell's vehicle, shattering the glass, forcing her to pull over. Ms. Cartmell contacted the police and waited for them to arrive. Ms. Dowell confirmed Ms. Cartmell's account, also identifying the defendant as the shooter. Both women testified they were shocked by the defendant's actions. Detective Chad Swallows documented the damage to Ms. Cartmell's vehicle and interviewed the passengers.

Dr. Adele Lewis, a medical examiner in Nashville, was present for the victim's autopsy, which was performed primarily by Dr. Amy Hall. The autopsy revealed the victim died as a result of "multiple gunshot wounds." Specifically, Dr. Lewis explained the victim suffered one gunshot to the face and separate wounds to the chest and back.

After the shooting, the defendant arrived at the Lebanon Police Department to turn himself in. After taking the defendant into custody, Officer Cody Bryan recovered a nine-millimeter pistol from the defendant's vehicle. Officer Bryan also recovered bullets and casings from inside the defendant's vehicle. The casings recovered during the investigation were analyzed by Special Agent Teri Arney of the Tennessee Bureau of Investigation. Agent Arney's investigation indicated the defendant's weapon, recovered by Officer Bryan, matched the casings recovered at the scene of the murder and within the defendant's vehicle.

After the State rested, the defendant attempted to call his sister, Kim Bass, to testify about conversations she had with the defendant prior to the murder. The State objected. During a hearing outside the presence of the jury, Ms. Bass testified about discussions she had with the defendant on December 18, 2012, two days before the murder. During that conversation, the defendant warned Ms. Bass that people had been following him and "that he had thought a gang had had a hit on him, and he said that they killed our mother because they couldn't get him." Ms. Bass testified that the defendant's mother had passed away from natural causes about two weeks before the shooting. However, Ms. Bass testified that the defendant told her he believed his mother had died from a gunshot wound. Additionally, on the day the defendant's mother died, Ms. Bass explained she had to take a gun away from the defendant because he was threatening to kill himself. Ms. Bass did not speak to the defendant the day of the shooting. The trial court rejected the defendant's argument that Ms. Bass's testimony fell under the excited utterance exception. It also rejected the contention that the defendant's statements to Ms.

Bass related to his "then existing mental condition." The trial court stated in the relevant part:

> [Ms. Bass] can testify about what she observed about [the defendant], whether or not he was upset, but his statements per se, they're inadmissible, and my ruling remains the same. . . . She said, people are following [the defendant], taking pictures of him. [The defendant] may have said that, but it doesn't have anything to do with the then existing conduct. I think you're trying to boot strap that and obviously I don't think you can do that. I just don't think it applies here. . . . She can testify about what she observed about him . . . [s]he just can't get into what he said to her.

After the determination by the trial court, the defendant chose not to call Ms. Bass to testify.

The defendant then called Dr. Stephen Anthony Montgomery, a forensic psychiatrist at Vanderbilt University. Dr. Montgomery testified the defendant lacked the capacity to premeditate his crimes. Dr. Montgomery interviewed the defendant in June of 2014 and also reviewed the defendant's past medical records. In his adolescence, the defendant had been diagnosed with "major depressive disorder," and on "a couple of occasions" required hospitalization. Dr. Montgomery testified the defendant "seemed to be paranoid" based on the defendant's belief that his mother had been murdered. Based on his evaluation, Dr. Montgomery diagnosed the defendant with "major depressive disorder," "borderline personality disorder," and "substance abuse disorder," all of which were exacerbated by the defendant's abuse of alcohol, marijuana, and cocaine.

Dr. Montgomery testified the defendant "was acutely depressed, not only with the grief, but was also suicidal [on the day of the shooting]." Dr. Montgomery stated the defendant "was very impulsive," did not have good judgment on the day of the shooting, and was delusional. Dr. Montgomery concluded the defendant was not "able to pause and exercise judgment and reflection before acting." Dr. Montgomery did not believe the defendant was "malingering," though he added the tests on this diagnosis were "somewhere in the indeterminate range."

Finally, the defendant called his father, Michael Wayne Starks, Sr., to testify. Mr. Starks was present at the defendant's residence when the defendant shot the victim. When the victim arrived at the house, the defendant said "there's these bitches that killed my mama." After the shooting, Mr. Starks saw the defendant depart in a red vehicle.

In rebuttal, the State called Dr. Rokeya S. Farooque, an expert in the field of forensic psychiatry. The defendant was evaluated at Dr. Farooque's facility, Middle

Tennessee Mental Health Institute, for a period of thirty days beginning in July 2013. In her expert opinion, Dr. Farooque explained the defendant "was able to form the requisite mental condition to commit first-degree murder." In particular, Dr. Farooque's tests concluded the defendant was "faking really bad" and skewed the test results. Dr. Farooque concluded, based on the tests, the defendant suffered from depression and a mood disorder. She concluded, however, these illnesses did not prevent the defendant from forming the requisite mental state. Due to the defendant's erratic behavior, Dr. Farooque prescribed an anti-psychotic medication to manage the defendant's behavior while he was in jail.

At the conclusion of the testimony, the defendant made an oral request for a special instruction on voluntary manslaughter. The defendant requested the following language be added: "The statute requires 'adequate' provocation there is no requirement that there is 'rational' provocation." The trial court denied the request stating:

> I read your case and I'm sticking with the standard charge. Let me tell you why. I read your case. Number 1, it is an unreported case. Number 2 . . . I view . . . as dictum . . . that change [of] phraseology or that addition to the charge. And so, with all due respect, I am going to deny that modification on that charge.

At the conclusion of the trial, the jury convicted the defendant of the lesser-included offense of second-degree murder for the killing of the victim. For the attempt charges, the defendant was convicted of one count of attempted first-degree murder of Ms. Cartmell and four counts of attempted second-degree murder of Ms. Logue and her four minor children. The defendant was convicted as charged on the two counts of aggravated assault. Following a sentencing hearing, the trial court sentenced the defendant to serve thirty-two years on the second-degree murder conviction, thirty-two years for the attempted first-degree murder conviction, sixteen years each on the four attempted second-degree murder convictions, and eight years each on the two aggravated assault convictions. The trial court ordered the second-degree murder conviction to run consecutively to the attempted first-degree murder conviction. The remaining convictions were ordered to run concurrently, for an effective sentence of sixty-four years.

## ANALYSIS

On appeal the defendant raises three issues for consideration. First, he argues the evidence was insufficient to support the jury's finding of attempted premeditated first-degree murder, attempted second-degree murder, and second-degree murder. Second, the jury did not receive a proper instruction on the elements of the lesser-included offenses of

voluntary manslaughter and involuntary manslaughter. And third, the trial court improperly ruled Ms. Bass's testimony as inadmissible hearsay. The State argues there was sufficient evidence, the jury was properly instructed, and the hearsay was correctly excluded. Upon our thorough review of the record, we agree with the State.

I. Sufficiency of the Evidence

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

A. Second-Degree Murder

In the instant case, the jury convicted the defendant of second-degree murder. "Second-degree murder is . . . [a] knowing killing of another." Tenn. Code Ann. § 39-13-210 (2014). "A person acts knowingly with respect to a result of the person's conduct

when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). "To establish that a defendant committed a second-degree murder, the State has the burden of proving beyond a reasonable doubt that (1) the defendant killed the victim, and (2) the defendant committed the killing with a 'knowing' state of mind." *State v. Parker*, 350 S.W.3d 883, 904 (Tenn. 2011).

The evidence, considered in the light most favorable to the State, showed the defendant shot the victim several times after he greeted the victim at his door. Witnesses testified they saw the victim run away from the door, holding his face after having been shot. While the victim was waiting for the ambulance to arrive, he identified his shooter as "Buddy," a known nickname for the defendant. The jury heard testimony that the casings recovered from the crime scene matched the weapon owned by the defendant. The medical examiner testified the victim's cause of death was the result of multiple gunshot wounds to the face, back, and chest. Based on the foregoing and when viewed in a light most favorable to the State, the evidence was sufficient for a jury to conclude beyond a reasonable doubt that the defendant knowingly shot and killed the victim. As such, the defendant is not entitled to relief on this issue.

### B. Attempted First-Degree Murder and Attempted Second-Degree Murder

Additionally, the jury convicted the defendant of attempted first-degree, premeditated murder of Ms. Cartmell, and four counts of attempted second-degree murder of the other four occupants of Ms. Cartmell's vehicle. "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3). First-degree murder is "a premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). In this context, premeditation is "an act done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). Tennessee Code Annotated section 39-13-202(d) further states:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* "The element of premeditation is a question for the jury which may be established by proof of the circumstances surrounding the killing." *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006) (citing *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997)). The Tennessee Supreme Court has identified certain factors which tend to support a finding of premeditation, including: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime[;] and[,] calmness immediately after the killing." *Bland*, 958 S.W.2d at 660 (citing *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992); *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1992)). *Bland* does not include an exhaustive list of factors for consideration when finding premeditation. *State v. Adams*, 405 S.W.3d 641, 663 (Tenn. 2013). A conclusion the killing was premeditated may also be supported by the nature of the killing or evidence establishing a motive. *Id*. Likewise, lack of provocation by the victim, failure to render aid, and destruction or secretion of evidence may also support an inference of premeditation. *State v. Larkin*, 443 S.W.3d 751, 815-16 (Tenn. Crim. App. 2013) (internal citations omitted). Finally, the firing of multiple shots can allow a jury to infer premeditation. *State v. Halake*, 102 S.W.3d 661, 669 (Tenn. Crim. App. 2001) ("Additionally, in the instant case the victim was shot multiple times, which although not indicative of premeditation when considered by itself, can be considered as evidence of premeditation in addition to other proof of premeditation.")

The jury heard proof that after the defendant shot the victim he fled the scene in a red vehicle. During his flight from the scene of the first shooting, the defendant chased down Ms. Cartmell's vehicle on Interstate 40, aimed into her vehicle, and fired his weapon into her vehicle. Furthermore, a search of the defendant's vehicle produced a weapon that matched shell casings found at the scene. There were additional shell casings within the vehicle indicating the defendant discharged the weapon while driving. Ms. Cartmell and the passengers inside her car were all unarmed and even indicated at trial they did not view the defendant as a threat until he began shooting. Additionally, the jury heard testimony from Dr. Farooque indicating the defendant was capable of forming the requisite mental state and premeditating his actions. While the defendant presented contrary testimony from Dr. Montgomery, the jury determines the credibility of witnesses and the weight afforded to the evidence, and this Court does not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. Accordingly, this Court presumes that any conflicts in Dr. Farooque's and Dr. Montgomery's testimonies were resolved by the jury in reaching its verdict. *See Campbell*, 245 S.W.3d at 335; *State v. Adams*, 45 S.W.3d 46, 55 (Tenn. Crim. App. 2000). Based on the fact the defendant fired at unarmed victims and Dr. Farooque's opinion that the defendant was capable of premeditating his actions and was deceptive in his interview, the evidence was sufficient to support the jury's verdict of attempted first-degree murder. Furthermore, this same

evidence also supports a jury's verdict of an attempted "knowing" killing. *See* Tenn. Code Ann. § 39-13-210(a)(1). The defendant is, therefore, not entitled to relief.

II. Jury Instructions

A defendant has a right to a correct and complete jury charge. *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). This right is constitutional in nature. *State v. Phipps*, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). The trial court must present the propositions of law governing the case plainly to the jury, in such a manner as to enable them to comprehend the principles involved. *State v. Williamson*, 919 S.W.2d 69, 80 (Tenn. Crim. App. 1995). "Nothing short of this will 'satisfy the demands of justice' or the defendant's right to a jury trial." *Id.* (quoting *Crawford v. State*, 44 Tenn. 190, 195 (1867)).

Under the Tennessee Rules of Criminal Procedure, a party requesting special jury instructions "may file written requests that the court instruct the jury on the law as set forth in the requests." Tenn. R. Crim. P. 30(a). "A trial court will not be placed in error where a requested instruction is not in writing." *State v. Timothy M. Hodge*, No. M2001-03168-CCA-R3-CD, 2002 WL 1732357, at *5 (Tenn. Crim. App., Nashville, July 26, 2002) (citing *State v. Mackey*, 638 S.W.2d 830, 836 (Tenn. Crim. App. 1982)). Because Rule 30 of the Tennessee Rules of Criminal Procedure "envisions that such requests be made in writing," oral requests for instructions are not sufficient for an appellate court to find that the trial court's instructions were improper. *Mackey*, 638 S.W.2d at 836.

In the defendant's case, the jury instructions were not requested in writing as required by Rule 30(a) and *Mackey*. Tenn. R. Crim. P. 30(a); *Mackey*, 638 S.W.2d at 836. Thus, on appeal, we conclude that the trial court did not err by denying the defendant's proposed jury instructions. While the trial court does note that it "read your case," there is no written request included in the record before this Court. It is the defendant's duty to prepare a fair, accurate, and complete record on appeal to enable meaningful appellate review. *See* Tenn. R. App. P. 24(b). Regardless, the defendant is not entitled to relief on the basis of this issue. Defendants have a "constitutional right to a correct and complete charge of the law." *State v. Teel,* 793 S.W.2d 236, 249 (Tenn. 1990). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." *State v. Davenport,* 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing *State v. Harbison,* 704 S.W.2d 314, 319 (Tenn. 1986)). A trial court's denial of a request for special jury instructions is error only when the trial court's charge does not fully and fairly state the applicable law. *State v. Cozart,* 54 S.W.3d 242, 245 (Tenn. 2001). The record here reveals that the trial court correctly and completely instructed the jury on the law as it applied to the facts in the case, which included issuing the pattern jury instruction on actual and constructive possession. As such, we conclude

that the trial court committed no error in its refusal to give the defendant's requested special instructions.

Even if the defendant had made his request for a special instruction in writing and it was included in the record on appeal, any error on the part of the trial court in denying the defendant's request was harmless. Harmless error is an error which does not "affirmatively appear to have affected the result of the trial on the merits." Tenn. R. Crim. P. 52(a). The defendant wished for the jury to consider his irrational delusion that the victim had killed his mother as sufficient provocation to warrant a finding of voluntary manslaughter. However, the jury found the defendant guilty of second-degree murder, attempted first-degree murder, and attempted second-degree murder, in addition to the other charges. Because the jury convicted the defendant of offenses greater than voluntary manslaughter, any error regarding the manslaughter instruction is harmless because the jury did not consider that charge. *See State v. Williams*, 977 S.W.2d 101, 108 (Tenn. 1998); *State v. Boyd*, 797 S.W.2d 589, 593 (Tenn. 1990) (Any possible error in failing to instruct voluntary and involuntary manslaughter, when second-degree murder was charged and the defendant was convicted of first-degree felony murder, was "completely harmless."). The defendant, therefore, is not entitled to relief.

III. Admissibility of Hearsay Evidence

The defendant asserts he was prejudiced by the trial court's ruling concerning Ms. Bass's hearsay statements. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is generally not admissible. Tenn. R. Evid. 802. A trial court's findings of fact or credibility determinations underlying a decision to admit or exclude hearsay are binding on an appellate court unless the evidence preponderates against them. *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). The appellate court reviews de novo the determination of whether the statement is hearsay or whether it is subject to an exception to the rule against hearsay. *Id.* We review for abuse of discretion the determination to exclude otherwise admissible hearsay based on relevance or on a balancing of probative value and prejudice under Tennessee Rule of Evidence 403. *Id.*

In the instant case, the trial court excluded specific statements as hearsay but permitted Ms. Bass to testify as to her observations of the defendant. In response, the defendant made a tactical decision to not call Ms. Bass as a witness. Regardless of the defendant's decision not to call Ms. Bass to testify regarding the matters the trial court found admissible, any error on the part of the trial court in excluding other portions of the testimony was harmless. The defendant was able to offer extensive expert testimony from Dr. Montgomery as to the defendant's delusions and mental state. Additionally, the

defendant presented testimony from his father about delusional statements he made immediately prior to the shooting. Because the defendant was able to offer additional testimony and evidence that illuminated the defendant's mental state on the day of the shooting, we find no prejudice in the exclusion of Ms. Bass's hearsay testimony. *Cf. State v. McLeod*, 937 S.W.2d 867, 873 (Tenn. 1996) (noting the weight of other admitted evidence made any error in determining the admissibility of specific hearsay harmless). The defendant, therefore, is not entitled to relief.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
J. ROSS DYER, JUDGE